Thank you, Your Honor, and may it please the Court. I realize it's on me, but I'm aspiring to reserve six minutes for rebuttal. All right. This case concerns the meaning of an expressly defined term in a written contract heavily negotiated by sophisticated parties. The case should never have gone to the jury, either on the express contract claim or the implied covenant claim, and certainly the jury should not have been asked to decide the case without the benefit of admissible evidence and jury instructions critical to the defense. First, on the express contract theory. The trial court erred in two ways. First, in submitting the issue to the jury at all, and second, in failing to grant judgment for the defendants. In California, contract interpretation is for the court unless two things are both true. One, that the plaintiff's reading plausibly accounts for the language of the contract, and two, even if that's the case, there is also a significant conflict in the material extrinsic evidence, not just the inferences that can be drawn from evidence. In this case, neither of those things was true. Selador argues that the contractual right to share in defined contingent compensation expressly entitled it to 50 percent of ABC's profits from Millionaire's Network Run. But that contention, which would have made this contract unprecedented in television history, cannot be reconciled with the text of the contract. Defined contingent compensation is a defined term, and the detailed definition, which plaintiff quite tellingly never quotes once in its 96-page opposition brief, starts with the receipts of BVT, the production company, and then deducts various expenses incurred by BVT, the production company. It never mentions or references ABC, the network. Yes, Your Honor. Help me on something here. There are a couple of things that I understand that understand to be important. One is that California, for practical purposes, does not have a parole evidence rule. You can get parole evidence in even if the contract is clear. Second, the test for us at this point, since the case has already gone to a jury trial, is whether the jury could plausibly have concluded from the evidence that the deal for Selador was 50 percent. And it doesn't matter whether it's ABC or Buena Vista that makes the money because they thought their deal was with Disney. Now, I understand your argument, and you have a very plausible argument to the contrary. However, when I look at the contract, what I'm seeing here is a plausible argument their way. When I read the main contract that has all the signatures and every blank is full, ABC signed, everybody signed, Selador signed, Paul Smith signed, every individual signed it. It uses a virgule, ABC slash BVT. So it looks to me as though it's a 50-50 deal. Selador gets 50 percent, ABC and Buena Vista. The virgule sometimes means and, or, or, or either, or both. It's kind of an inherently ambiguous symbol. So I wondered what it meant. And it looks like they get half the money and Disney's companies, ABC and Buena Vista, get half the money. Then when I, they say, to figure out what profit is, take a look at Exhibit B. And then I look at Exhibit B, and it doesn't have any of the formality of the contract. It's not signed. The two blanks are not filled in, the blank, the critical blank for the percent that anyone gets. It says producers shall be entitled to blank percent of 100 percent of defined contingent compensation. So it looks as though this is just their form definition of defined contingent compensation. And, of course, it's only in terms of Buena Vista. Why isn't it plausible for the jury to conclude that it was a 50-50 deal between Selador and Disney, which is what the Selador witnesses testified to, and that as the Selador witnesses testified and as these documents would seem to allow, all that Exhibit B is there for is to say how to calculate what you mean by profit. Okay, I'll try to, I'll try to take on all of those questions. If I, if I forget to address any of them, please, please help me. First of all, this issue was not for the jury, and I'll explain why, that the contract was clear and not susceptible to their reading. The question of whether it goes to the jury is whether their reading fairly accounts for the express language. And it was, it was also not the case that Selador's witnesses said that they thought they were entitled to 50 percent. The agents and the judge instructed, the judge ruled that William Morris was the agent of Selador, full stop. They both testified unequivocally that they knew that the, that defined contingent compensation, which was the, quote, measure of profits, leaving aside executive producer fees and advances, keyed on the revenues and expenses of BVT. Why would anyone make a deal like that? I mean, they're both owned by Disney, and it's very easy to manipulate the private deal between two Disney subsidiaries so that whoever has to give 50 percent doesn't make any money. Well, I mean, the fact of the matter is that the, and I'm going to go back to your original point, which is the derived by ABC and BVT language. Right after mentioning that this Exhibit B is no boilerplate. The blanks were filled in in the contract itself. Exhibit B was included as a definition of defined contingent compensation and incorporated. So the question is, the trial judge was concerned about the fact that the definition of defined contingent compensation related only to revenues and costs of BVT, but the contract itself says that Selador is entitled to 50 percent of defined contingent compensation under B derived by ABC and BVT. I take that to be, ABC slash, which could be and or or, either one. I acknowledge that. There is no inconsistency whatsoever between a provision that identifies from whom Selador is entitled to receive defined contingent compensation and the provision defining what defined contingent compensation is. That is, what are the inputs to the formula? So the reason that the derived by provision is in there is to guarantee that Selador would, in fact, receive its full share of the defined, defined contingent compensation. Regardless of where that money ended up in subsequent negotiations between BVT and ABC over the terms of the assignment and license back that was necessary to produce and air the show. And in fact. That makes perfect sense to me. Okay. What you're saying is the contract, I guess the body of the contract,  so it's going to be BVT, ABC and or. But the money you're going to get, you look to B for, correct? Correct. Perfectly logical. However, it also seems that with the testimony offered, you could find yourself in a, well, that seems logical, but then you turn to the other side and they say, but wait a second. Our guy's going in. We didn't want to deal. We were dealing with Disney. You know, we're over there across the ocean, et cetera. We're dealing with ABC lawyers. ABC people are negotiating it. And we have testimony that says that say what you might about exhibit B. We thought we were getting the whole banana, including ABC. Okay. So that's what the district judge is now looking. Is that plausible under the contract? To rule in your favor, I think we'd have to say that somehow the contract wouldn't, under any construction, support that approach. Is that right? Otherwise, it would then go to the jury and they'd figure it out. Well, I mean, you would have to find the district court, and therefore your court, would have to find that their interpretation of the contract takes account of, fairly takes account of all the terms in the contract. If the answer to that is no, and we suggest that it is, it doesn't go to the jury. It's for the court. Even if the answer to that is yes, it only goes to the jury if, when you look at the extrinsic evidence, there is, in fact, there is a significant, meaning sort of outcome issue determinative, conflict in the material admissible extrinsic evidence. And that's not the case here. May I ask you about, it seems the real bugaboo here is the exhibit B and the definition and the use of the, how can I get it, BVT in that. So my question then would be why that wouldn't raise an ambiguity in the contract that, in fact, when you try to slot B into the main contract, that just raises an ambiguity because it's BVT, and their testimony is BVT, ABC. Look, we were dealing with ABC. Well, there's no question that they knew that they were dealing with BVT long before this contract was signed. Our brief points out, I mean, the principal agent was Greg Lipstone, and the lawyer for William Morris was Angela Petillo. On November 30th, 1998, months before the contract was even signed or even drafted, his notes clearly reflect that he full well knew that the defined contingent compensation, that A, BVT was involved. I mean, BVT sent a whole delegation to London to talk with Mr. Smith's crew about this. But Lipstone says in his November 30th notes that it is BVT that has the right to alter Selador's, will have the right to alter Selador's petition participation, not ABC. And in any event, the extrinsic evidence shows the following. The terms of this deal were negotiated by Mr. Lipstone, one of the most sophisticated agents in the business. Mr. Smith, who did testify on the stand that he thought that he was going to get 50 percent of the profits, never once testified that that was communicated to ABC or any of ABC's agents. And Mr. Silverman, who was the William Morris salesman in London who contacted Smith, also said that that was his understanding, but he, too, never testified that he communicated in any way with ABC. And, in fact, Mr. Smith testified that he left the negotiations about compensation and revenue to Mr. Lipstone. That's at pages 466 and 663 of the excerpts of record. And he testified that there was no way to know. He had no way to know what ABC and BVT had been told. That's at page 753 to 56 of the record. Now, the agent who made the deal, Mr. Lipstone, and the William Morris lawyer who negotiated the contract, and by the way, Judge Kleinfeld, far from being boilerplate, Exhibit B was heavily negotiated and amended. Not only are there interlineations, but there are eight little exceptions to the standard definition in the rights agreement itself. I don't see the interlineations. The only legible copy I could find here was the one attached to the red brief, and I don't see what you mean. I may have misspoken. It may be that there are interlineations on the main contract, but if you look at excerpt of record 3089, which says, Defined contingent compensation shall be defined, accounted, and distributed in accordance with the standard definition. ABC, BVT standard definition, which is attached as Exhibit B, except that, and then it has little i through little i8, which are exceptions to how one might otherwise construe the language of Exhibit B. So Exhibit B was heavily negotiated, and the record concludes. Wait a minute. What you've just shown me is that the contract that's signed by everybody also has an interlineation that's initialed by everybody. Right. I have to confess. You have not shown me that the addendum defining defined compensation is interlineated and initialed. Right. I may have misspoken about that. Here's my point. There is an entire more, there's two pages of the rights agreement itself in which it says, it's subsection B3 on pages 3089 through 3091 that list eight enumerated. Would you give me the page reference again that you're looking at? Yes. 3089 through 3091. This is, I'm looking at the appendix to our blue brief. There are, it says, okay, defined contingent compensation is going to be calculated as an Exhibit B, except that, and then it has eight exceptions that reflect the heavy negotiations over how Exhibit B and the definition of defined contingent compensation would be termed. But I don't understand why it makes the alternative argument implausible as opposed to mistaken if we were on a jury. Okay. The alternative argument is implausible. In fact, it's impossible for a number of reasons. Number one, it does not take, they have to take account with the defined term definition, and the derived by language says nothing about what constitutes defined contingent compensation. Exhibit B makes it crystal clear that it includes all sums received by or credited to BVT, and unless they have an interpretation that squares with that expressly defined term, the contract question is, A, for the court, and B, requires judgment for us. Independently, if I just may add one other point, their very proof in this case refuted their theory. They say, and it's the very first sentence of the argument section of their brief, that the contract expressly entitled them to 50 percent of ABC's profits. They never put on any evidence at all in the trial about what those profits were, what the revenues were, what the costs are to operate and run a television network. So we're entitled to judgment as a matter of law because there was an essential failure of proof on that claim. I thought they put on a spreadsheet showing that, and the question is its admissibility. No, no, no. What they put on was a spreadsheet. This is on the damages case. What they put on was a spreadsheet showing the calculations of what their two experts thought would be a, quote, market value license fee. It had nothing to do with profits. There was no testimony whatsoever about profits in the case. And they may get the, somehow, let me just see if I get this right, because if you look at the Exhibit B, you're talking about revenues, correct? Well, it's revenues minus expenses, and both of them are BBTs. Right. And there's nothing in there about profit. Or do you think that they keep saying it's a profit-sharing agreement. So the question is, if you look at B and you have the revenues minus the little cutouts, do you characterize that as profits? Well, it's the profits. You could characterize it as a definition of profits for BVT. In other words. I understand. Yeah. Our objection to their use of the term profits is that they're using it to say we're entitled to the profits of ABC and BVT, and they don't ever take on the language of the BVT profit participant sharing arrangement, which is defined in Exhibit B. But there's more. If you look at the contract rights, it's not just that the gross receipts in Exhibit B are those of BVT and not ABC. All of the expenses and fees that can be deducted in order to produce the net that then has to be shared 50-50 are costs that apply to a production company, not to a network in any respect. And the contract gives, as one would expect, gives Selador the right to audit in the event that there's a dispute about whether the contract is being fairly complied with. But it's an audit only to BVT's books. Yes, Judge. I have a question that hung me up as I was digging through this record, and I don't quite know what this means. Prior to trial, the district court granted an in limine motion because of discovery violations, and I quote this, which precluded plaintiffs at trial from claiming they're entitled to share directly in ABC's revenues. And then the court said despite this ruling, plaintiffs are not prevented from claiming an indirect share of ABC's revenues that should have flowed to plaintiff through BVT. What did that mean, and how did that play out in the trial? Okay, first of all, I don't think that this is a discovery violation. What happened was that for 10 years from the time that Selador and William Morris began receiving these participation statements, which prelucidly show that these are BVT revenues and there is a network deficit, they never complained about this. They never suggested for 10 years that why aren't ABC's profits, why aren't ABC's revenues in here. They filed their lawsuit on a different theory. And five years after the lawsuit was filed and two years after discovery closed, they filed a piece of paper with the court that said in a footnote that they were entitled to 50% of ABC's revenues. And it was on that basis that the court said you are not allowed to claim that you are directly entitled to 50% of ABC's profits. Was that a contract claim, directly entitled to 50%? Yes. In fact, if you look at the very first sentence of their argument on Roman numeral one, their first sentence of the brief says that we were. And their theory, we thought this ended it. The judge did say, as Your Honor recited, they aren't precluded from introducing evidence of ABC's profits as part of an argument which would be an implied covenant argument. There was a breach because they were jiggling.  You know, I kind of read this and said it looks like the contract is out. We thought so too. And that didn't happen. It didn't happen. That's why that left me somewhat confused. Well, I am confused for sure. And I can tell you that the trial lawyer was confused about why this is coming in. And here's the real anomaly of this case. The judge said, look, a footnote ten years later and two years after rediscovery closes is not going to allow you to make this claim. You can introduce evidence about revenues and costs of ABC and profits to show that the license fee should have been renegotiated up to account for the profits. And I'll address that in the implied covenant part of the argument. Well, maybe I won't. I want to reserve a couple minutes. You're already in the hall. Okay. Thank you.  Well, I think it would be a good question to ask my friend on the other side. I'll do it. As well as this judge Trott. How, in their view, how is this supposed to work? Okay. They weren't allowed to prove that they share 50 percent with BBT and 50 percent directly with ABC. I'd better get my question in. This is so that we can move along. Okay. What Judge Cooper wrote in her order, I was going to start out with your opponent on it and then come back to you and rebuttal, but I better get it out now. It's like free bowing. The Selador did not plead and present the case on the theory that they were entitled to half of whatever ABC made. Correct. So Judge Cooper said, well, it's too late now to come up with a new theory. You're not allowed to prove that you're entitled to half of what ABC made. However, to the extent that ABC made some money that BBT should have made because of the deals between ABC and BBT, you are allowed to prove that and claim that money even though as a technical matter it was profit made by ABC and not by BBT. Now, when I read that, my thinking was, well, covenant of good faith and fair dealing. I know in California that's sometimes pleaded as a separate claim, but traditionally what it means is you just construe a contract in accord with the implied covenant of good faith and fair dealing. If A is dealing with B and C, and B and C are both owned by a parent company, and A agrees to only take the profit that C makes and not the profit that B makes, it is an invitation to a breach of the covenant of good faith and fair dealing by the parent company to just shift the profit between B and C so that none of it's payable to A. That's what the judge is saying Selador can still claim, and it seems to me that in this case it's a perfect fit. Well, why not? There is no question that they're, I mean, my point with Judge Trott, and it's responsive to your honor as well, is that ABC's profits were never part of the proof. So their express contract theory, which was a lawyer's contrivance just before trial, has to fail. Now, they still have, it doesn't defeat a theory that there was a breach of the, we have a contract and there's a breach of the implied covenant. The implied covenant, you know, in California and elsewhere, is not a warrant to do some extra contractual substantial justice based on how everything worked out. It is a requirement that each party act in good faith to provide to the other the benefits of the express contract bargain. So in any event, if we're right that they have no express contract theory, we have to get a new trial on implied covenant because... You've briefed that and we have that in mind. Yeah. Okay. We'll give you some time for rebuttal, but you're six minutes past your time already. So if you would sit down, we'll hear from Selador. Okay. I'll respond when I get back up. Thank you. Good morning, Your Honors. Robin Meadow appearing for Selador. I guess I should go straight to the question of damages, and I will. Maybe you should go first to the question of the contract. In your brief, you say the rights agreement requires ABC to share its millionaire profits 50-50 with Selador. So in light of the argument just made and the judge's pretrial ruling, maybe you can clarify on your express contract claim if, in fact, you went forward on express contract and you're relying on the rights agreement as providing the 50-50. Yes. There are actually two parts to that. The 50-50 profit split, and I want to talk about that in a lot of detail because the evidence is far more expansive than counsel has described. The 50-50 profit split is a question of liability. What does the contract provide and what are we entitled to? The license fee versus proof of profits versus proof of revenues is a damages theory. Now, if you accept that we proved a 50-50 profit split and there was more than enough evidence for the jury to do it, then the first question is, did we get that? What's the evidence that you had a deal for 50 percent of ABC's profits? The multiple communications, well, first of all, Your Honor, we think it's a jury question, and that really should be the beginning. Okay, if it's a jury question, that means there must have been evidence for it. So what's the evidence for it?  He had Mr. Bartlett of ABC, the lead negotiator, who made the terms of the deal and who testified that the terms of the deal should not have changed following his conclusion of those terms. His notes say 50-50 split, network cable syndication. Mr. Lipstone's notes say the same thing, 50-50 split, network cable syndication. Mr. Silverman, who initially brought the parties together, and it's correct, he didn't communicate with ABC, but he had the same understanding. So that wouldn't be relevant if he didn't – if it wasn't communicated? Well, he – but he – It's like hiding under the bush, Your Honor. It is, Your Honor. I mean, is that relevant for whether the court should send it to the jury? It is only in this sense. A core part of ABC's argument is that everything William Morris knew, Selador knew. There's lots of reasons why that's not necessarily correct, but one of the things that Mr. Silverman knew was that this was supposed to be a 50-50 split. So – but the other aspect to this in terms of – The question is 50-50 split of what? What? And it's a problem that Judge Cooper identified that you don't seem to have pleaded that you're entitled to 50 percent of ABC, BVT, whichever, doesn't matter, just BVT. Well, let me address that because if you go to the very language of the contract in the first line of the rights agreement, ABC and BVT are collectively defined as ABC slash BVT. It is ABC and BVT. And it's interesting that, you know, we've been accused of not citing the dispositive language or not quoting it in our brief. One of the things you practically never find in ABC's brief is any reference to ABC slash BVT, which is the other party to this contract. In fact, you'll find it outside of a quote only once, and you'll find it in a quote only a handful of times. But ABC – Well, I don't think it really matters how many people cited which or which. We have the contracts, and so that's what we're going to look at. I appreciate that. But ABC slash BVT is what this deal is about. The deal was between them. Well, I think their reading is it's a deal between Selador, party of the first part, and ABC and Buena Vista together, party of the second part, to give Selador 50 percent of Buena Vista's profits. Well, that's their version of it, but it – I think it's a plausible reading. The question is whether you're – exactly what your reading is and whether it's plausible in light of the evidence presented. That's correct, Your Honor. We think our reading is the more reasonable reading, particularly in light of – It doesn't have to be more reasonable. It just has to be plausible because it went to jury trial. That's correct. And we have – let me back up a step and talk about the evidence generally. That's what we need. ABC's position is that you can interpret a contract – must interpret a contract as a matter of law when it was negotiated among three different companies, four if you count BVT, with multiple people from each company, with multiple interactions among the players at all levels because there were direct communications between Selador and ABC at the very beginning and at the very end. A literal snowfall of memoranda, meeting notes, e-mails, drafts of the contract, a lot of different people's recollections as to what they thought at different times. And that somehow leaves us with a question for the court. There is no case – Was there evidence that Buena Vista shifted or Disney shifted some of what would ordinarily be profit in Buena Vista to ABC? Well, let me explain it a little bit differently. Yes, but not quite the way Your Honor has described it. The revenue, leaving aside merchandising, which is a distinct issue, the revenue for the network run all comes from ABC. There isn't any other source of revenue. BVT is only a source of expense. You've got all the revenues coming in and then you've got BVT, which produces the show, incurring the expense. So I think the answer to Your Honor's question is there isn't any BVT revenue per se. It all comes from ABC. There is no other source. So – But doesn't B – doesn't B – I mean, if you – that might be too in the abstract, but don't you have to look from the rights agreement and then look to Exhibit B for the definition? Yes, except for the fact that what we have is an ambiguity because what the rights agreement says is that we – first of all, the rights agreement is with ABC BVT. And the rights agreement says – the main text of the rights agreement, you look at the thing as a whole, but the main text says that we are splitting profits 50-50 of the defined contingent compensation. Then it does, of course, refer over to Exhibit B, but – This is something, though, in terms of the evidence. If it is, as you say, and what you say is perfectly reasonable, the network makes all the money because they license people to put on the show, and the production company spends all the money because they do all the work to put on the show, and you make a deal and the measure of what it is that you're going to split 50-50 is limited to what the production company made as profit, unless it snuck some money over to ABC that it shouldn't have, which Judge Cooper made as an exception to her order. Then it seems to me you have to show that the production company snuck some money over to ABC that it shouldn't have, and if you don't have evidence of that, you're in a difficult position. Well, that's as much as to say that we knew we were entering into a contract. And really, ABC's core theory of this case is that we knew we were entering into a contract in which we could never make any profits. I guess their theory is you just make money from reruns or something like that. Well, there are no money-making reruns of game shows. There are money-making new syndication. Their theory is maybe we should wait for syndication. I turn on the TV in a hotel, there's always an episode of Law and Order. There's a big difference. And I assume somebody's getting paid for that. It's a game show. You're saying it's a different market. Game shows don't have reruns. You do go into syndication, and this show did go into syndication with original production of game shows with a different host. But, Your Honor, the deal-makers, the people who- So why would these sophisticated lawyers negotiating this contract not make that clear? I think they thought it was clear. Mr. Lipstone testified that if he had thought this was a no-profits deal, it never would have been signed. And importantly is, you know, the way the money plays out and the reason that ABC- Well, sometimes people dealing at arm's length do make deals with each other where the beneficiary thinks, Is the other guy nuts? There aren't going to be reruns of a game show. What? They went with a conventional deal anyway. I think that's basically ABC's theory here. Well, conventional deal is an important point, Your Honor, because ABC's core theory is that this was business as usual. Everybody knew what was going into this deal, and most importantly everybody knew that license fee equals production costs. And what I mean by that is the way they view-the way Exhibit B works from their point of view, ABC pays money-ABC pays a license fee to BVT in order to be able to broadcast it. BVT produces, ABC broadcasts, so ABC pays the license fee, which just happens to equal the cost of producing the show. So that it is always, at best, a break-even for BVT, no profit, and in fact is a loss because the way the contract is structured, the more shows you make because there's an overhead charge and things like that, so it keeps going down. Sure, that's sensible, but I don't think you appealed Judge Cooper's order, did you? Well, no, we-you mean with respect to the limitation on proof? I do want to come to that because we think- You're not allowed to prove ABC profits except for indirect profits where the money should have been made by BVT. Revenues. Revenues. Yes. And that makes a difference. Now, let me switch gears and talk to-I'm sorry, I want to complete the thought first about- Let me just clarify that because it seems like there's this collision between the order and then the trial. It's like we have the order and then all of a sudden we've got a trial, we've got an express contract, 50-50, go into trial, the jury gets to decide what it decides, and then we have the, you know, the jiggle, the sliding over money, the implied covenant. So how does it happen that we get from Judge Cooper's order to a direct violation of the rights agreement for 50-50 profits? Well, again, and I think Judge Phillips made this point during some of the colloquies, we need to distinguish between the liability and between the proof of damages. And before I address that, let me point out that we do have-I think-we think we went on the contract, we think it was a jury question and the jury got the answer right, but we have a very compelling, I would say almost overwhelming, implied covenant case and the measure of damages- Let me explain, though. I mean, we can say one is liability, one is damages, but is it your view that Judge Cooper's order only went to damages? Yes. Okay. Yes. What the order says- Simple thing. If that's your view of it, then I'm understanding better, but we've been talking past each other with all this. Well, the order says- It says, Plaintiffs are hereby precluded at trial from claiming they are entitled to share directly in ABC's revenues. Correct. That sounds like you're precluded from urging upon the jury a theory of what the contract means. I don't think anybody read it that way. I think ABC's theory is that the effect of that was to bar proof of damages. It doesn't say so. Well, I understand that, but it says we are not precluded from claiming an indirect share of ABC's revenues, which clearly works in the implied covenant context, but also works in the express covenant. Since it's not appealed, what it means is you can't share in ABC's revenues except to the extent that those revenues were derived from money that should have been paid to BVT. That's what it says. Yes. Essentially, she says, you need to prove your lost profits by way of the structure. So what money should have been paid to BVT that instead was paid to ABC? Well, everything goes to ABC. The question is how much ABC should have paid to BVT that should have flowed through to us. How does that relate? You were going to come back and say it relates both to the implied covenant, which I understand that theory. How does it relate to the express contract theory? What we proved as an alternative was essentially a subset of it, and let me construct exactly how that worked. First of all, we actually, although we didn't go through the exercise of we put up ABC's total revenues because we didn't have that, or at least we didn't have the specific evidence of it. Then we put up their total expenses, and then we split it. There was evidence. There was actually very strong evidence of what ABC's revenues were because our experts, in arriving at the implied license fee, explained how revenues are generated through ad rates. We have the spot ad rate. There's no dispute about it. $271,000 for a 30-second ad. You have 16 1⁄2 an hour, 15 minutes in an hour. You have 354 hours worth of programming. So in 10 seconds with a calculator, the jury knew that the total revenues were in the range of $2 to $3 billion. So that number was there. What we proved instead was an expression of the revenue, the revenue essentially flowing down through a funnel of a license fee, and let me explain why that's true. The expert testimony, and there's really no dispute that this concept was right, although they quibbled with some of the details of the testimony, is that license fees are based on success. Revenues are based on success. The two things flow together. If you have a successful program, you get a higher license fee. You get higher ad revenues. So ABC's ad revenues flowed directly into the number that our experts came up with, the license fee that ABC should have paid to BVT, as part of the arrangement that I described, instead of the artificially limited license fee limited to production costs. Now, the reason that matters is that we are proving revenues and profits indirectly, and more to the point, we're proving a number that is certainly less than ABC's profits. ABC is basically complaining that we didn't prove enough damages. Let me go back to, I guess, maybe I'm missing something. So before we leave here, I hope I understand what you're saying. I read the, when we started, the sentence from your brief that says, we're entitled under the express contract of 50-50. And that's what the brief says. So I read that and I say, well, I've got to look at the contract to see if it says that. But in most of this discussion, you're in to imply covenant territory. So I just want to understand, in light of the ruling and in light of what's in your brief, whether, in fact, the case goes to trial under a theory. It doesn't have anything to do, at least under the express contract, with direct or indirect. It's just, we're entitled to 50% of ABC. Well, it did go to, it went to trial in the theory. The jury verdict asked the jury to interpret the contract in terms of whether ABC is a source of revenue, for lack of a better term. It's in the special verdict. So the jury interprets the contract and it basically says, yes, this is a contract with ABC, BVT. They're both liable, and they're both liable to split profits. But we didn't ask for a true split of profits in the sense of total revenues minus expenses because we were barred from doing it. So we proved our 50-50 split case, and we proved a breach of it because there's no dispute that we didn't get that. The only question is, did we prove damages with sufficient ---- You didn't get what? 50% of what? We didn't get 50% of ABC's revenues minus ABC's expenses. And we were not allowed to ask for that. You're not allowed to ask for that. That's correct. You know, I'm still back at the 2 or 3 billion, which obviously is what impressed the jury, too. That's in advertising revenues. But it doesn't look to me like the advertising revenues go to Buena Vista. It looks like they're supposed to go to ABC. They're not improperly shifted from Buena Vista to ABC. Your Honor, you put your finger on the exact problem. ABC brings in, let's say, $2 billion. It reports $515 million via or I should say BVT reports $515 million of revenue paid by ABC under their license fee equals production costs supposed deal, the deal which is not documented anywhere, not even by a conversation, but that's what they claim it is. Where does BVT get its revenue? ABC. And merchandising, but we're not talking about that. So ABC pays Buena Vista to produce the show? Yeah. And this is actually where I left off a little earlier. The way mechanically, and there's no dispute about this, there's a license between ABC. ABC and BVT get the license together. ABC has the right to put the show on television, right? BVT produces it. BVT has the license, too. I mean, one of the five or six different deals in which these licenses floated around everywhere was a license from BVT. Kind of like if I write a book, I'm entitled to the royalties on the book, and if I hired somebody to do a table of contents for my book, that's an expense. If I hired a production company to put together my book and they do a pretty picture for the cover and they do a table of contents and they proofread it all, I want to keep what I pay them as close to what they spend as possible. And if I understand correctly, the ABC-Buena Vista argument, producing a TV show works just the same way. That is their argument. But the result of that argument as to us... Which would mean there's no revenue that should have been credited to Buena Vista but was actually credited to ABC. Well, it all comes in from the outside to ABC. I mean, there's no question that ABC gets money for these programs from advertising. That is the source of revenue. BVT produces the show. And in an arm's-length fair market license environment, our experts testified that ABC would have been paying... If ABC were a third party, an independent third party, ABC would have had to pay $2.4 to $3 million to BVT per show. Instead, they paid, you know, something like $825,000. And the net result of that... So that's back to the implied covenant theory, really. Well, it is, unless you recognize that if you read the contract as requiring a 50-50 split, in other words, if we get past that hurdle, then the question is, okay, as I said, we did not prove the totality of that number, we proved a subset of that number, a revenue-driven number, which is the reasonable license fee, which happens to work, obviously, for implied covenant as well. And that makes sense to me, but you did say something important, and that is if we get past... So I understand on the damages side your theory for calculation, but I'm still having trouble on the liability side, I guess. Well... Because what you said before is, well, we're really not entitled to anything except indirect, but then your claim that the jury's looking at is not... It's really a direct breach of contract under the rights agreement. That's claim one, right? That's correct. And our ability to prove damages was not eliminated but was constricted, and so we proved damages within that regime. And, again, we did not prove revenues. We were not allowed to prove revenues. As I said, there is evidence of revenues, but not as part of the calculation, I think, is the safe way to say it. But the revenues drive the license fee, the reasonable license fee, and, you know, the show on the math that we provided, and it takes just seconds to figure it out, it's $8.6 million of ad revenue for an hour show. But that's not your money, that's ABC's. I'm trying to figure out something here. If I understand the theory that you presented and that the jury bit, the jury accepted it, your expert says that ordinarily if a company hires a production company to put on a show like this, it's going to cost $2 or $3 million per episode. And in this case, ABC hired Buena Vista for less than $1 million per episode. It got too good a deal. So the jury multiplies the extent to which the deal is too good compared to what you would usually have to pay an outside production company by the number of episodes, and that's your damages. What I don't get is why ABC can't do that under the terms of the contract, both written and considering the extrinsic evidence. It seems to me that it's more like when a large corporation uses a captive insurance company to cover its risks because it's cheaper and they get to deduct the premiums. But if they had to maintain a sinking fund, it would be non-deductible. I mean, it's an economy of scale that Disney has. We're not claiming that they weren't entitled to use an internal company. And why can't they use the internal company and keep it cheap? Just basically, just like with the captive insurance company, you have experience-based premiums with the internal company. You just pay them what it costs with really no profit to speak of. Because they have an outside party. External company, they'd have to pay them enough money so it was they make money. Well, that's exactly right. They don't have to with the company where Disney owns them both. They could do whatever they wanted. And in fact, it's really just one company on the other side because the evidence makes very clear that whatever these relationships were, ABC was controlling them. So it's just ABC. If ABC wanted to, it wouldn't have to create a separate production company. It probably just does it in order to have separate corporate entities for, I suppose, tax and liability purposes. And if it didn't have a separate production company and it was able to produce an episode for $800,000, great, instead of paying an outside company $2 million. More power to it, but they're supposed to be sharing the income or sharing the profits with us. Our deal is with ABC-BVT. Let me try something on you. Was your theory that the defendants structured the license fee arrangement in a way that unfairly denied Selador the benefit of their bargain for a percentage of BVT's profits? Yes. That's pretty much what it boils down to, isn't it? On the implied covenant. And that becomes the implied covenant. And so that's how you kick back to the 50-50, that you were denied by that structuring. Not exactly, Your Honor. I think the 50-50 split is just a 50-50 split and we either proved sufficient damages or not. We think we did. Right. We proved it was a 50-50 split. But that's your implied covenant. The implied covenant basically says, okay, read the contract the way ABC says it ought to be read. We're still entitled to revenue that flows through BVT and we're entitled to the reasonable expectation of the contract, which would have been 2.4 to 3. ABC can run its show any way it wants, but it can't unilaterally set up things on its side of the deal so as to make it a no-win situation for us. Why not? They reported a 70 million. It seems like the real money here is advertising revenue. That's where the $2 or $3 billion is. Sure. So I look for some language where it says we get half the advertising revenue, and it doesn't say that. And the only reference I can find to it is Exhibit B, Paragraph 2, out-of-pocket advertising promotion and distribution expenses relating to the pilot and or series. And I understood that. You'll educate me if I misunderstood it to mean money that Buena Vista actually spends to promote this game show rather than money that advertisers pay to get 30-second spots on the game show. That's correct, Your Honor. But we never ‑‑ I mean, they always characterize this as being a claim to revenue. I mean, we never, under any reading, would have a claim to revenue. What we have said is from day one, our deal, the deal that's reflected in the notes of everyone ‑‑ Your claim is basically for what an independent production company, as opposed to a captive production company, would have charged ABC to do the production work. No, Your Honor. Our claim is that from day one, the deal was a 50‑50 split of profits with ABC. With ABC. With ABC. The captive company issue is an implied covenant issue, not an express contract issue. You know, there isn't anything in here that says we had an expectation of a certain license fee. So that's a little bit different than you said before, and that's where we started. And that is basically under the first claim, you're saying you get 50 ‑‑ it's a 50‑50 split with ABC, correct? Of profits. Profits. Profits. Yes. Okay. Would you address one other thing? If we were to disagree with you on the contract going to the jury, how would that affect the implied covenant claim? Because, of course, ABC has argued that it's somehow infected, and even if you were to lose on Part 1, you should lose on Part 2 as well. I'm sure you disagree with that, but tell me why. Well, for one thing, what they see, there's several reasons. One is a simple waiver issue. This is a special verdict. There were plenty of opportunities if counsel were concerned that it didn't adequately express what the jury was doing. There was a lot of colloquy. And I recognize the special verdict was finalized, you know, in the last minutes before the case went to the jury, but the jury had the case for a week. And when the jury came back, counsel's first obligation is to look at it and say, does this verdict work? Does it make sense? And they didn't make the argument that they couldn't understand the verdict. They understood it perfectly well. But there's another aspect to it. We know to a certainty, or a virtual certainty, that the jury found for us on the breach of implied covenant on the network license fee, and the reason for that is this. The verdict had, there was an implied, there was an express contract verdict and an implied contract verdict, and each of them covered express and implied contract with respect to, I'm sorry, each of them covered a network license claim and a merchandising claim. But as the case went to the jury, there was no implied covenant merchandising claim. It was still in the verdict form, but there was no evidence of it. We made, the only proof we ever offered and the only argument we ever made was that they were not supposed to deduct merchandising expenses. That was the express language of the contract, ambiguous but interpreted. It was not an implied covenant claim. So when the jury comes back, yes, Your Honor. I asked you whether your claim didn't amount to 50 percent of the extra million or two that an independent production company would have charged per episode, and you said no. Our claim is for our deal of a 50-50 split with ABC. But that brings me right back to the unappealed order from Judge Cooper. That brings me right back to the unappealed order from Judge Cooper that says you're precluded from claiming that you're entitled to share directly in ABC's revenues. I understand. I want to make sure my comment was clear. When I talk about our deal and talking about the express contract claim, when we claim they paid an insufficient license fee, I'm not being clear. Why would ABC pay a license fee to Buena Vista? Well, they did pay a license fee. Why did they move the license all around? I don't know the answer to that, but they did pay a license fee to Buena Vista. There isn't a dispute about that. The question is whether ABC, because it's really only ABC on the other side of the contract, whether they are controlling the flow of money in such a way. I mean, Buena Vista, BVT, reported $515 million with this truncated arrangement they had, and we still had a $73 million loss. So what we're saying is that ABC controlled the operation of the license fee in a way that violated the covenant of good faith and fair dealing. But when I talk about license fee vis-à-vis the express contract, we are using the implied license fee, same number, but we're saying that that is an adequate proof of damages under the 50-50 breach. Because, I mean, we weren't allowed to prove revenues minus expenses. We offered a substitute measure of damages, a more favorable measure as far as ABC is concerned because it's a much lower number. Thank you. Okay, thank you. I appreciate your time. You're out of time, Mr. Waxman, but we've taken up a lot of your opposing counsel's time as well. We'll give you three minutes for rebuttal. Let me go right to the implied covenant, because notwithstanding everything that my friend has said, we are entitled to judgment as a matter of law with respect to the implied covenant. The trial court ruled that there was no evidence that ABC and BVT had ever acted in subjective bad faith. And the notion that this was all about ABC and BVT was some captive production company is ridiculous and refuted by the record. These two sibling companies fought like cats and dogs, each of them to get the best deal. They say, well, their whole theory is, well, the license fee should have been higher than it was. The license fee in this case, there was no dispute in the evidence whatsoever. The license fee in this case equaled 100 percent of BVT's production costs. The testimony was it never, ever, ever gets any better than that. Even their expert was unable to cite a single contract in history in which the license fee exceeded the production costs. Many of them are only 50 percent or 70 percent. But the point here is that because there was no subjective bad faith, they can prove a violation of the implied covenant only if they show that what ABC did was objectively unreasonable. And they can't do that for two reasons. First of all, as a matter of law, conduct cannot be objectively unreasonable if it was actually anticipated by the parties who negotiated the contract. And here, Selador's agents, Lipstone, who negotiated the deal, and Petillo, who negotiated the contract, both testified unequivocally and without any dispute, A, that they knew that BVT was going to grant ABC a perpetual license because the rights agreement itself is perpetual. B, that they knew that the purpose of the perpetual license was to avoid renegotiation. Three, they expected a network run deficit because network license fees at best equal production costs and the production company always takes a percentage fee charge before defined contingent compensation is allocated. Now, after the show was a success, the first participation statement comes to William Morris as agents for Selador. And William Morris then writes a letter. This is a letter from Mr. Leffin. It's at page 3299 of the excerpts of record. He circulates this letter with everybody in William Morris who ever negotiated any part of this deal before sending it to Selador. And he says, quote, with respect to the participation statement, the structure of the statements appears to comply with the terms of your contract and based on the figures provided appears to be fairly calculated, noting that, quote, the contract defines gross receipts as all sums received by or credited to BVT. Now, Selador got that and they had some problems with the participation statement but nothing to do whatsoever with the license fee equaling production costs. They thought the merchandising costs were too high and they thought William Morris' agency commission was too high. But they never, ever, ever suggested the contrary. And Mr. Leffin's advice to his principal shows that, in fact, when they got the participation statement, which showed pollusively that there are no ABC revenues or costs, that this fairly complied with the structure of the contract, which provided that receipts were going to be BVT's receipts, not ABC's receipts. Thank you. Was there any evidence contrary to the position that you've just articulately stated? What was the other side to that? There was no evidence. Here's what the other side was. They argued to the jury that, well, Mr. Lipstone and Ms. Petillo might have testified falsely because they were interested witnesses. Now, they were never questioned about this. There was never any argument or suggestion about this in the trial. But they said, well, the jury didn't have to necessarily believe that they were testifying truthfully. That's standard jury instruction, though, isn't it? Credibility is for the jury. They're free to take somebody who says X and conclude based on any number of things that that's not the case. Well, fair enough. But what they said is you don't necessarily have to believe these two people. Now, the evidence was overwhelming that to the extent these witnesses had any interest, it was in getting Selador's participation as high as possible, A, because their commission was going to be a percentage of that, and, B, because at the same time that Selador sued BVT and ABC, it also threatened to sue William Morris for being a ---- So maybe the jury, though, must have disregarded the testimony that you've just given us as dispositive. No, I don't think so. What happened in the ---- if you're looking at what the jury did, and I'm now talking about the matter of law and judgment in our favor, the jury was told that the covenant of good faith protects the benefit of the express contractual bargain, and they were told that that bargain entitled Selador to 50 percent of ABC's profits. So why the ---- I mean, if you were told that, the contract entitled you to 50 percent of ABC's profits, and you have to deal fairly in providing the benefit of that bargain to Selador, under that theory, I mean, why wouldn't the jury think that there was a violation of the implied covenant? But here, I mean, there is not only did their agents, the parties to the contract, anticipate precisely how the contract was going to be performed and how the revenue streams would work, but you also, as a matter of law, cannot have a violation of the implied covenant unless the plaintiff demonstrates that measured against some objective norm, the conduct fell short. And they have ---- Thank you. I think we've got your argument well in mind. Thank you, Your Honor. The case just argued. Selador v. ABC is submitted. I want to thank both counsel and also for the briefing on this.
judges: Trott, Kleinfeld, McKeown